# Richmond.

## RICHMOND & DANVILLE RAILROAD CO. v. DUDLEY.

### NOVEMBER 16th, 1893.

1. EMPLOYEES—*Injuries—Contributory negligence—Disobedience.*—Where, contrary to rules, conductor allowed cars to be shifted and run down grade without an engine to control them, and whilst he was between the cars, a brakeman, without objection from the conductor, caused another car to run down the same way, which, by reason of. defective brakes, could not be controlled, and struck the first-named cars with such violence that the conductor was injured,

HELD :
> The conductor cannot recover on account of his own negligence and disobedience of the rules.

2. IDEM—*Presumption.*—Railroad companies are entitled to presume that cars delivered to them by connecting companies are in proper condition.

3. IDEM—*Failure to inspect.*—Conductors who are required by the rules to inspect all cars picked up in transit, cannot recover for injuries received by them by reason of their failure to inspect such cars.

Error to judgment of circuit court of Culpeper county, rendered March 25, 1892, in an action of trespass on the case, wherein David Dudley, the defendant in error, was plaintiff, and the Richmond and Danville Railroad Company, the plaintiff in error, was defendant. Opinion states the case.

*Wm. H. Payne* and *J. C. Gibson,* for plaintiff in error.

*F. L. Smith* and *Edmund Burke,* for defendant in error.

FAUNTLEROY, J., delivered the opinion of the court.

A transcript of the record, including a certificate of all the evidence adduced before the jury at the trial, is exhibited. After the evidence was all in, a multitude of instructions were presented upon both sides, some of which were granted to plaintiff and defendant, and some were refused to both. The jury rendered a verdict for the sum of $9,000 damages against the defendant, which verdict the defendant moved the court to set aside, because the verdict was contrary to the law and evidence; because of misdirection by the court; because the verdict was excessive; and because of misconduct on the part of the jury; which said motions the court overruled, and entered judgment upon the verdict. A demurrer to the declaration, the court had likewise overruled.

It appears from the record, that on the 12th of December, 1889, the plaintiff below—defendant in error here—a freight conductor in the employment of the defendant company, was conducting a freight train from Charlottesville to Alexandria. At Culpeper, an intermediate station, he received a telegraphic order to shift certain stock cars then in and upon a side-track of the defendant's road, north of its station at Culpeper to another side-track of the defendant south of its station at Culpeper, and also to take into his train a certain car loaded with spokes, which was in and upon the side-track north of Culpeper. The conductor, Dudley, who received this order, directed his men—including a brakeman named Munday—to go and shift the cars; and he addressed himself to the undertaking of the removal of a car which obstructed the street in the town of Culpeper. The men whom he had ordered and sent to shift the cars attempted to effect the shifting by dropping them down the track without the grasp or control of an engine; and his attention was called to the fact that two of the cars so dropped down the track were running down the grade without any one upon them—running "wild," in railroad parlance. The conductor, Dudley, pursued, overtook and stopped these cars, and was in between them, endeavoring to get a

coupling pin out of the drawhead of one of them, when Munday, whom he had sent to do the shifting, removed the wooden chock from under the car loaded with spokes, as it stood at the head of the grade, where it had been left when pushed out of the siding, and put his shoulder to start it, when it went down the grade, gathering momentum so rapidly that it got beyond the control of the brake, and ran with great velocity and violence against the cars which Dudley had stopped, and caught and mashed and severely hurt him between the cars, where he had placed himself in the endeavor to extricate the coupling pin as aforesaid; whereupon he exclaimed: "My God! Munday, you have killed me; how often have I told you about this before?"

Dudley was an old conductor with twenty years' experience in railroad service. He was engaged at the time of his injury in his regular and appointed work, which he was paid to perform. By the rules of the company, which were placed in his hands in the form of a regular book, and by special orders constantly repeated, he was instructed, generally and particularly, as to his duties. He represented the company, commanded the crew and the train, and was responsible for the protection of the company's property. By the rules of the company, as well as exnecessitate, a train, once launched upon its career, must be under the absolute control of one person, whom all connected with the conduct of the train are in duty bound to obey. The law requires and approves this order and discipline. See *R. & A. R. R.* v. *Moon*, 78 Va. (Hansbrough), 745–750; *R. & A. R. R.* v. *Johnson*, 84 Va. (Hansbrough), 713; *Railroad* v. *Williams*, 86 Va. (Hansbrough), 176; *Railroad* v. *Ayers*, 84 Va. (Hansbrough), 679; *Railroad* v. *Rudd*, 86 Va. (Hansbrough), 648.

Proper rules must be made, and the conductor must obey and enforce them. *Donnelly* v. *N. & W. R. R.*, 84 Va. (Hansbrough), 858.

Dudley was injured sixty miles from a terminal point, while

its train was out upon its run, and where he was in absolute command. The order which set the cars in motion, down grade, without the control and grasp of an engine, in gross violation of the express and especial rules of the company, and which injured him, was given by him to Munday, whom he knew and declared to be an open, reckless, and frequent violator of that particular rule, " Z," which explicitly forbids the attempt to shift cars without the connection and control of an engine, yet whose disobedience and reckless violation of the rules of the company he never reported. He turned his train and his own special duty over to his reckless subordinate, absented himself from the operation and direction of the shifting, and observed nothing till he sees the car flying wildly down the grade of the track and hears the shout, " Look out! there goes a car down the main track without brakes on it." He pursues this car, leaps upon it, and rides it down to its destination. He knew that it was moving in gross violation of the general orders and express rule of the company, yet with this disobedience of orders by his subordinate under his eyes; with the general and special rules of the company in his pocket, he did not give even a hint of disapproval of any sort of the dangerous disobedience and misconduct of his subordinates, until he is injured by it, between the cars, where he had placed himself in violation of the rules of the company made to protect him and the property of the company from injury, and which common experience and prudence advised him was a most perilous position. While in this perilous position, his disobedient subordinates, encouraged by the approval of his silence, launched car after car, four in all, down grade, in defiance of Rule " Z," without even a forbidding word or waive of the hand from him, until one, heavily loaded, goes wildly down the descending grade, acquiring too much momentum to be controlled by its brake, which Munday applied to it, and plunges against the cars which he had stopped and between which he had placed himself, when he, instinctively,

recognized the cause of his injury by the exclamation, "My God, Munday, you have killed me! How often have I told or warned you of this before!" It is clear ·that if Dudley had been at his proper post of duty and enforcing obedience to the express and imperative rule of the company as to the only allowable and safe mode of shifting cars, he would not have been hurt. It is clear that if Rule " Z," so often, so imperatively, and so constantly repeated, had been observed, he would not have been injured. If he had even used reasonable prudence in keeping from between the wild-cat cars, or had simply signalled a forbidding disapproval of what was going on in violation of rules which it was his special, peculiar, and paramount duty to enforce, he would not have been injured. The company had ordered this conductor into no perilous duty; there was absolutely no danger in shifting cars if Rule " Z " had been observed; and the company had taken every precaution to impress Rule " Z " upon the men, and it was present only in the person of the conductor, who defied and disobeyed its rule, and who had promised to prevent the very disaster which was caused primarily and proximately by his disobedience and gross negligence.

It is claimed that the brake upon the car loaded with spokes was defective, and that this caused the injury. But the answer to this is, that the rules of the company made it the express duty of the conductor to see to the careful inspection of all cars which he should put into his train in the transit, and that this duty he did not perform. It was put into his train without inspection, report or information of any defect whatever; it was carried to Manassas and thence to its destination. It was a Pennsylvania car, which had brought freight to, and carried freight from Culpeper without any discovered or known defect. The railroad companies in handling the vast mass of commerce which burdens their roads, have a right to presume that cars delivered to them by connecting lines of great railways are in proper condition. McKinney on Fellow Servants,

sec. 26; Patterson on Railway Accidents, sec. 241; 21 Amer. and English Rep., 561, 564; 15 Amer. and Eng. Rep., 196.

It is not required that railroad companies shall have inspection shops and special inspectors all along the line of their roads. It is apparent that they are largely dependent upon their conductors, into whose hands their trains are committed, whose duty it is to inspect any cars which they pick up and incorporate into their trains in the transit. This it does appear was not done by Dudley or his subordinates *en route.* But Dudley himself not only did not know anything about the defective brake, but he is quite clear and certain, that in spite of the numerous warnings that he had given to Munday "about this thing before," but which he had practically concealed from his employees, Munday caused the accident and not a defective brake. Munday himself, who used the brake, knew nothing of any defect, nor did Deland, the engineer. Thornbury, an exceedingly swift and self-contradicted witness, testified that he shouted to Munday "not to start that car, it has no brake on it." In the next sentence he says, "Munday let off the brake," which he had just sworn was not there; and after the car had got far down the hill and was running rapidly he says he called to Munday, "not to let it get the start of him, the brake is not in order." When examined as to how he knew about the brake, he said he examined it *after the accident*, and "had no opportunity to examine it before." And when confronted with his testimony on a former trial, as to the brake, he admits that "he does not know what was the matter with it."

But, even if it were conclusively proved that the brake was defective, the conductor, who was injured by its being set in motion by his own negligence and disobedience of the rules of the company, cannot recover. The promoting and the dominating cause of the injury in the case, which controlled every subsequent event, was the turning of the cars loose upon the track and ordering the shifting to be done without an

engine, in violation of rule " Z " of the company, and the failure to inspect before incorporating the car in the train. See McKinney on Fellow Servants, sec. 31, George's case, 88 Va. (Hansbrough) 223.

The foregoing review of the evidence, bringing us to the conclusion that the appellee, Dudley, was the victim of his own gross negligence and disobedience of the rules of the company, and cannot recover damages for his own wrong, renders it wholly unnecessary to advert to the errors assigned as to the instructions given and refused by the court.   We are of opinion that the verdict of the jury and the judgment of the circuit court of Culpeper are wholly erroneous; and our judgment is to reverse and annul them.

JUDGMENT REVERSED.